UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| AUDREY DELORES MITCHELL, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   3:16-cv-00102-HNJ |
| | ) | |
| UNIVERSITY OF NORTH ALABAMA, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

This action proceeds before the court on defendant's Motion for Judgment on the Pleadings.  (Doc. 30).  Defendant directs the motion to plaintiff's third amended complaint and the addition thereto.  (Docs. 14 & 15).  Plaintiff also filed additional allegations on August 3, 2018 (Doc. 47), which the court considers as part of her pleadings for purposes of this motion.  For the reasons set out herein, the court **GRANTS** Defendant's motion.

## STANDARD OF REVIEW

A party may move for judgment on the pleadings only after the pleadings are closed.  *See* Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts."  *Interline Brands, Inc. v. Chartis Specialty Ins. Co.*, 749 F.3d 962, 965 (11th Cir. 2014) (internal citation

omitted). In determining whether a defendant is entitled to judgment on the pleadings, courts must "accept all the facts in the complaint as true and view them in the light most favorable to the non-moving party." *Id.* The court treats the factual allegations in the non-moving party's pleadings as true, and takes as true those moving party allegations which do not conflict with the non-moving party's pleadings. If denied, the court deems the moving party's allegations false. *Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998). If comparison of the averments in the pleadings reveals a material dispute of fact, the court must deny judgment on the pleadings. *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

In ruling on a motion for judgment on the pleadings, courts apply the same standards as applied to a Rule 12(b)(6) motion to dismiss. *See Strategic Income Fund, LLC v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 n.8 (11th Cir. 2002). A court must grant the motion for judgment on the pleadings if, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993). Accordingly, to avoid the granting of judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). "Dismissal is not appropriate unless the complaint lacks sufficient factual matter to state a facially plausible claim for relief that allows the court to draw a

reasonable inference that the defendant is liable for the alleged misconduct." *Jiles v. United Parcel Serv., Inc.*, 413 F. App'x 173, 174 (11th Cir. 2011) (per curiam) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)).

## FACTS

Plaintiff Audrey Mitchell, an African-American female, formerly served as the University of North Alabama's (UNA) Director of Environmental Services and Housing Facilities Management.[1] UNA originally hired Mitchell as Coordinator of Administration in the Department of Housing and Residence Life on August 9, 1999. UNA named Mitchell Interim Director of Housing and Residence Life in 2004, choosing her over Kevin Jacques (Caucasian), who served as Associate Director of Residence Life. Jacques reported to Mitchell when she served as Interim Director. After UNA promoted Mitchell over him, Jacques undermined Mitchell and reported anything to their supervisor, Thomas Lovett (Caucasian), which Jacques believed may result in discipline for Mitchell. However, Lovett never verbally reprimanded her or disciplined her in writing.

UNA hired David Shields (Caucasian) in 2006 as Vice President of Student Affairs. After his hire, Shields split the Housing and Residence Life Department into the Department of Housing and the Department of Residence Life. He named Jacques as Director of Residence Life and Mitchell as Director of Housing. Jacques

---

[1] This department formerly existed with the name "Housing."

reported alleged issues with Mitchell to Shields, and Mitchell had to respond to the allegations and refute them. Mitchell alleges Shields and Jacques schemed together to look for any possible mistake by Mitchell and treated Mitchell more harshly than her Caucasian counterparts.

As an example of this alleged unequal treatment, Mitchell recounts an incident occurring during the Summer and Fall 2009 semesters. Mitchell submitted a purchase order to Cindy Conlon's office for replacement furniture for a student apartment; Conlon (Caucasian) approved the purchase order. After delivery of the furniture, Mitchell realized she omitted a dinette set. She submitted a purchase order for a dinette set. However, Conlon advised Mitchell she could not make the purchase without a bid and Conlon's previous approval for purchase of the other furniture constituted a mistake, against bidding law, and she should not have approved it. Conlon instructed Mitchell to request a disbursement from the Controller's office. Donna Tipps (Caucasian), the Controller at that time, returned the disbursement request to Mitchell and admonished her for submitting it. Mitchell emailed Tipps, with a copy to Conlon, advising Conlon directed her to submit the requisition to Tipps.

In May or June 2010, Shields contacted Mitchell about reports he received that Mitchell authorized donating UNA furniture to students. Mitchell denied the allegations and asked Shields to speak to Assistant Director of Housing Jimmy Waddell (Caucasian). When Shields spoke with Waddell, he first informed Waddell he was not

attempting to "get" anyone, in particular Mitchell. Waddell related to Shields that several Resident Assistants and two professional staff members approached him about obtaining old furniture which UNA was discarding; Waddell allowed them to retrieve some couches. Waddell also allowed an indigent family to obtain two couches. Waddell informed Shields he did so without Mitchell's knowledge or approval. Approximately a week later, Shields asked Waddell to document the incident. Waddell submitted written documentation on June 24, 2010. Waddell never received any reprimand or other disciplinary action for this incident, despite violating UNA policy. Mitchell believes Shields wanted Waddell to implicate Mitchell; when Waddell denied Mitchell had any knowledge of the incident, Shields abandoned the matter.

On July 14, 2010, Mitchell met with Shields and Director of Human Resources and Affirmative Action Catherine White (Caucasian). At the meeting, Mitchell received an official reprimand letter and a $3,000 salary reduction for that year for authorizing replacement of a student's stolen property rather than requiring the student to submit the request to the State Board of Adjusters. The complaint originated from Conlon.[2] Mitchell claims White advised her to file any appeal with UNA President William Cale (Caucasian). Cale and Shields previously worked at the same institution.

_____

[2] Mitchell avers Conlon asked why Mitchell felt compelled to replace the student's furniture. Mitchell responded with her belief that the Resident Assistants, supervised by Jacques, would take property from students they thought were not returning to UNA. Shields accused Mitchell of failing to notify Jacques when the student came to Mitchell about his missing furniture, because Jacques advised Shields he knew nothing about the incident. However, Mitchell explained she sent the student to

5

Mitchell appealed the disciplinary action to Cale on July 18, 2010. She provided over 20 exhibits to her six-page appeal designed to demonstrate to Cale that Mitchell suffered discrimination and harassment, including the incident with Conlon and Tipps. Mitchell avers Conlon asked Cale to reprimand Mitchell for her actions regarding the furniture. Mitchell contends Shields and White knew Cale should not decide her appeal because of his involvement in effecting her discipline, yet they concealed this fact from Mitchell. Cale failed to meet with Mitchell about her appeal or investigate her claims, and he provided Mitchell's documentation to Shields but failed to provide her with documents Shields supplied to Cale.

A hearing on Mitchell's appeal convened August 6, 2010. A participant referred to a letter Shields submitted to Cale concerning his findings during an investigation, which Shields had not provided to Mitchell. Hearing chair Tom Osborne (Caucasian) stopped the hearing to provide Mitchell a copy of the letter; however, Mitchell did not have time to read it because the hearing reconvened as soon as she received a copy. Mitchell had to respond to the contents of the letter at the hearing, without preparation. During the hearing, White advised that she, Shields, Cale, and Vice President Steve Smith (Caucasian) decided Mitchell's sanction, and Cale gave final approval. The appeal committee suggested other options for Mitchell's discipline, yet Cale opted to

Jacques' office numerous times and provided proof Jacques' office knew about the incident. Shields expressed his belief Jacques did nothing wrong regarding the matter.

impose the original sanctions and probation. Mitchell claims she provided proof that Conlon violated policy by approving the initial replacement furniture purchase, yet UNA took no disciplinary action against her. She also asserts the mistreatment and harassment she experienced stemmed from Shields' desire to create a reason to terminate her or force her resignation.

Mitchell faults Cale for failing to meet with her about the documentation she provided; instead, Cale directed her in a letter to meet with Shields to work out their differences. However, when Director of Student Conduct and Assessments Kimberly Greenway (Caucasian), who also reported to Shields, expressed issues with Shields, Cale met with her and provided advice. Cale then met with Shields, and Shields subsequently apologized to Greenway.

After the pay reduction, Mitchell documented every interaction and endeavored to ensure her decisions and processes exceeded her Caucasian counterparts. She dreaded meeting with Shields because he demeaned her actions and questioned her judgment. Shields credited Jacques over Mitchell, despite Mitchell providing proof Jacques acted incorrectly. At one point, Greenway reported to Shields that Mitchell had been off work more than usual due to family illness, and thus, Mitchell believed officials watched her attendance more closely than other employees.

In May 2013, the local newspaper published an article regarding construction of new residence halls at UNA which portended a loss of jobs. When Environmental

Services staff, who reported to Mitchell, queried Shields about the article, he stated Mitchell should have informed them about the plans, and in the future, he would inform her staff directly regarding any developments that may affect their jobs. Mitchell contends Cale should have informed UNA staff before releasing the information to the newspaper, rather than Mitchell, because she had no authority to lay off or terminate employees, and Shields only told the Environmental Services employees Mitchell should have notified them to undermine her and make her appear incompetent. Mitchell did not report Shields' actions to Human Resources or Cale because she believed they would only cover for Shields.

On July 4, 2013, a resident emailed Mitchell that someone on Mitchell's staff took belongings from the resident's room. Mitchell investigated the report by speaking with Brenda Terry (Caucasian), the person responsible for cleaning the building. Terry relayed that on July 2, 2013, she saw two Caucasian Resident Assistants loading items into a car parked by the building. Video footage confirmed Terry's report. A day later, another resident reported someone removed belongings from her room, and Mitchell advised the student to inquire about her belongings with Resident Life. Resident Life Senior Administrative Assistant Patricia Wood (Caucasian) inquired if the resident had checked out of her room, which the resident denied. Wood advised the resident to return for her belongings in a couple of days; the resident never received all of her property. The resident informed Mitchell that several residents

reported to Shields that their property was missing from their rooms, leading Shields to wonder aloud about Jacques' office's involvement. Mitchell instructed Waddell to save the video footage from July 2. Mitchell contends the two Resident Assistants, whom Jacques supervised, committed felony theft, with Shields' knowledge, yet they received no reprimand or other disciplinary action.

In May 2014, Shields announced to Mitchell's staff in a combined meeting with Jacques' staff that UNA would combine their areas and name a new executive director. However, Shields knew UNA had not approved this action. Mitchell never agreed to the reorganization, though UNA told the Equal Employment Opportunity Commission during its investigation she had done so. Mitchell characterizes this statement as a blatant and intentional lie to cover up Shields' discrimination, harassment, and coercion of Mitchell and UNA's failure to prevent or correct Shields' behavior.

On July 11, 2014, Mitchell and Waddell attended a meeting to discuss reorganization, which Shields and White also attended. Shields began the meeting by discussing an earlier meeting Mitchell and Waddell had with then Vice President for Business and Financial Affairs Clinton Carter (Caucasian), of which Shields only recently became aware.[3] Shields told Mitchell and Waddell that as a result of the

_____

[3] At some point, Mitchell and Waddell met with Clinton Carter, and they discussed relocating to Carter's division. They asked Carter not to disclose the meeting to Shields. Carter then approached

meeting, they pitted Carter against Shields, lost credibility, and caused embarrassment to themselves, the Student Affairs Division, and Shields. Shields considered their actions grounds for dismissal. Shields then discussed the reorganization, which would result in demotions for Mitchell and Waddell, and asked if they were in agreement with possible job reclassification and reduction in payment. Shields provided Mitchell and Waddell with a copy of the reorganization chart and job descriptions.

Waddell met with Interim President John Thornell[4] on July 14, 2014. Waddell shared his copy of the reorganization chart with Thornell, who claimed he had not seen the chart. Waddell also inquired about Shields' comments about possible dismissal from UNA, claiming the comments caused Waddell and Mitchell to feel threatened and subjected to retaliation. Thornell advised them to convey to Shields their acceptance of the reorganization to avoid the appearance of insubordination. He also stated he would meet with White about the information Waddell shared with him at this meeting.

Mitchell met with Thornell on July 22, 2014. She discussed with him several incidents over the years she perceived as harassing and discriminatory, such as the 2010 sanction and appeal and the July 2, 2013, furniture removal incident. She further expressed her belief that Shields had White present at the July 11 meeting to intimidate Mitchell and Waddell into agreeing to the reorganization; lied about their meeting with

Interim President John Thornell with the idea to relocate Mitchell's department to his area. Thornell later informed Shields about the meeting.

[4] Cale left UNA on June 30, 2014.

Carter being an offense subjecting them to possible dismissal; and lied about the reorganization being a fait accompli that did not need their approval. She also shared her belief Shields intended to promote Jacques to Executive Director, making Jacques Mitchell's supervisor. Mitchell voiced her concern about any further one-on-one meetings with Shields and her inability to continue to report to Shields, and requested that UNA move her department under Clinton Carter.

In October 2014, instead of transferring Mitchell's department under Carter, Shields created a new position for her still reporting directly to Shields. Mitchell believed she would have some input into the decision, based on her discussion with Thornell; however, Shields rejected her idea. Shields described Mitchell's new assignment as a coordinator position yet still at a Director level. Mitchell considered the position a "lame duck" position without authority, performed under the monitoring of Shields in the office next to his. (Doc. 14 at 35). Mitchell advised Thornell she would not accept the position, but UNA offered Mitchell no other solution. Therefore, Mitchell had to continue reporting to Shields for several months and perceived this as punishment.

Mitchell lodged an EEOC charge and UNA received notification about December 4, 2014. She contends UNA purposefully lied to the EEOC that she agreed to the reorganization to make Mitchell's claims appear frivolous.

Thereafter, Mitchell and Waddell met with Carter and White about relocating under Carter's division. They told Mitchell Shields would allow the relocation if UNA divided Mitchell's area, placing the older residence halls and apartments under Mitchell's control and placing Jacques in control of two new halls being built, as well as newer cluster halls. Mitchell declined this arrangement, along with other possible arrangements suggested at three later meetings. Carter reminded Mitchell if she did not accept any of the offers, she would remain under Shields' supervision.

Around January 9, 2015, Shields agreed to allow Mitchell's Department of Housing to transfer under Carter's supervision. When Mitchell expressed to Thornell concerns about reprisal, he responded that the situation was similar to a divorce and all parties needed to move on. Mitchell alleges she experienced several incidents of retaliation and reported some, to no avail. Carter told her if she continued to make reports, it would not fare well for her and that the EEOC charge needed to go away.

To chronicle the claimed retaliation, Mitchell cites changes to the 2015-2016 UNA catalog portraying all areas of Mitchell's responsibility falling under Jacques despite the transfer to Carter's supervision, thus making it appear that Mitchell no longer worked for UNA. In addition, Mitchell cites a May 18, 2015, meeting in Jacques' office attended by people representing various areas of campus, including Carter, Mitchell, and Mitchell's new supervisor. Shields told the gathering he went through Mitchell's UNA website and found errors, such as a link to an incorrect form.

Mitchell had her administrative assistant correct the error within minutes. However, Jacques' UNA website contained multiple errors which Shields did not address, and certainly not in a roomful of peers.

In addition, in June 2015, Shields included in a report embarrassing and untruthful information allegedly concerning Mitchell's area. [5] However, the information appeared in the section involving University Residences, Jacques' area of responsibility. UNA usually disseminates the report to the media, deans, vice presidents, and Board members a week prior to the Board of Trustees meeting. Waddell reported the inclusion of this statement to Carter. The morning of the meeting, before it convened, Shields edited the report to omit the erroneous statement.

Mitchell met with Carter, at Mitchell's request, on June 9, 2015, to inquire about UNA's position on Shields' actions. Carter related that Shields apologized to him and expressed lack of knowledge that Jacques had included this statement, but Mitchell believed Shields should have apologized to her. Mitchell alleges Shields reads the annual reports before submitting the final copy for the Board meeting; therefore, he must have been aware of its inclusion. Mitchell faults Shields for failing to reprimand Jacques. When she complained to Carter, Carter discouraged her from reporting everything. Therefore, Mitchell advised Carter she would cease reporting to him and

---

[5] The summary stated University Residences wanted to combine the Residence Life and Housing departments, a beneficial action for students; however, Housing staff opposed the merger.

instead would document and submit her observations to the EEOC and her attorney; he agreed that might be best.

Mitchell alleges she reported harassment, discrimination, and coercion numerous times to numerous UNA authorities starting in 2010, yet none of these persons took any action. She also contends Carter's admonition to cease reporting all actions which she believed discriminatory, harassing, and retaliatory countermands UNA policy. She cites Carter's admonition as further evidence of a hostile work environment. She had to argue and resist Carter's attempts to give some of her areas of responsibility to Shields, and faults Carter for advising her to learn how to play office politics rather than protecting her. Mitchell alleges she began experiencing elevated blood pressure in 2011 and commenced medication to treat this ailment. After one particularly stressful interaction with Carter in December 2014, Mitchell's blood pressure rose to dangerous levels.

Mitchell also alleges she requested a copy of her personnel file but found it did not contain all documentation she submitted regarding her 2010 discipline. When Mitchell contacted Cale's office, he stated he would allow her to review her file, under supervision, but she could not make copies or take pictures. Mitchell claims the failure to allow her to copy her file violated UNA's policy.

Mitchell also refers to a policy violation by another African-American employee which resulted in termination. This employee, Jermaine Ferguson, transferred from

Mitchell's department to Shields' and Jacques' department, and Mitchell claims they used Ferguson to obtain information about Mitchell. However, when they no longer found him useful to them, they terminated him for a minor infraction.

Mitchell cites one instance during which she felt physically threatened and afraid. On August 5, 2016, after Mitchell no longer worked under Shields, the fire alarms in Mitchell's work building went off. After Mitchell left the building and then returned, the alarms continued to sound. Shields entered Mitchell's office without warning to advise her that they could not find the problem and all personnel had to evacuate the building again. Mitchell alleges she was startled and afraid because she did not know if Shields might snap, because of their prior difficult interactions, and possibly cause her physical harm. She expressed her preference that Shields never enter her office unannounced.

On September 14, 2016, Mitchell attended a meeting with White, Shields, Jacques, and interim Vice President for Business and Fiscal Affairs Evan Thornton. At the meeting, White read a statement noting the ongoing conflict between Mitchell and Jacques, which caused dysfunction at UNA and negatively affected the students. Therefore, UNA hired a consultant to assist in resolving the conflict. White requested Mitchell and Jacques prepare position statements on the issues as they perceived them. She admonished both of them to work through their issues and collaborate in a functional manner, or risk termination for insubordination. She mentioned problems

occurring during the Fall 2016 student move-in. White also stressed the confidential nature of the process and stated she would act as their sole source of contact.

Mitchell avers she received no notification or complaints about problems arising when the students returned for fall semester, and that her area no longer bears responsibility for the move-in process. Rather, her only involvement pertains to providing custodial support at Jacques' request. She expresses surprise that problems with the move-in process would lead UNA to hire a consultant, when her complaints over the years fell on deaf ears and prompted no investigation.

Mitchell asserts this litigation and reports about it in the student newspaper have angered UNA, and UNA therefore is retaliating against her by labeling her as a troublemaker and trying to gather evidence to terminate her. Mitchell alleges current UNA President Kenneth Kitts knows about the events of the past years, yet instead of addressing her concerns, he has accused her of committing acts causing harm to UNA, its students, and their parents, by hiring a consultant and threatening her job when she has no awareness of the basis for such accusations.

Mitchell complains she had to endure much to receive protection and relocation, even with documentation, yet Caucasian counterparts can achieve a person's removal with little to no evidence. As an example, she cites 2015 accusations by Caucasian women that their director made derogatory remarks about females, resulting in his immediate removal from his position based only on their word. Some of the women

recanted their statements, but UNA did not reinstate the director; however, he received a Friend of the University award and appeared in the homecoming parade. Mitchell contrasts this with her protests, supported by documentation, which failed to result in Shields' removal.

As stated previously, Mitchell filed an EEOC charge in December 2014, alleging race discrimination. It appears she filed an amended charge on January 13, 2015. (Doc. 1-1). Mitchell also filed an EEOC charge of retaliation in March 2015 (420-2105-01362), which she intended as an amendment to her January 2015 charge. However, the EEOC closed its investigation and sent a notice of right to sue on that charge in March 2015.

In the Third Amended Complaint, Mitchell asserts causes of action for race discrimination, pursuant to Title VII and 42 U.S.C. § 1981; retaliation, pursuant to Title VII and 42 U.S.C. § 1983; violation of Fourteenth Amendment due process rights, pursuant to 42 U.S.C. § 1983; hostile work environment, pursuant to Title VII and 42 U.S.C. § 1981; coercion, in violation of Alabama Code § 13A-6-25; and defamation, pursuant to Alabama Code § 15-8-150.

In a notice filed August 3, 2018, Mitchell asks the court to consider additional allegations in support of her claims in this action.[6]  She avers that on January 19, 2017,

---

[6] Mitchell filed an EEOC charge and received a Notice of Right to Sue regarding Charge No. 420-2017-02997 on May 10, 2018. (Doc. 47-1). However, the record does not contain a copy of the

Catherine White convened a meeting which included Mitchell, Shields, Jacques, White, and Evan Thornton (Caucasian). White announced effective February 1, 2017, Mitchell's area of responsiblity would transfer back under the auspices of Shields and combine with Jacques' area, with Kimberley Greenway serving as Executive Director over the combined area. Greenway stated Mitchell's office would adjoin Jacques' office effective June 23, 2017. Mitchell expressed disapproval of this plan to Greenway on June 21, 2017, and Greenway agreed to convey Mitchell's concerns to White.

White emailed Mitchell on July 25, 2017, stating her understanding Greenway initiated an effort to centralize offices into one area, which would result in close proximity of Mitchell's and Jacques' offices. White requested Mitchell write a summary of her concerns that such a configuration would create a hostile work environment, and Mitchell provided the statement by email on July 27, 2017.

At another meeting on July 28, 2017, attended by Mitchell, Greenway, and Jacques, Greenway advised that Mitchell would transfer from Student Affairs to a new position in Financial Affairs, effective September 1, 2017. Greenway further advised Mitchell that Kitts approved the transfer, and she could accept the new position, resign, or face termination. Greenway asked for Mitchell's response by July 31, 2017. When

_____

EEOC charge. Mitchell submitted a copy of Defendant's position statement in response to the charge. (Doc. 47-11). From this statement, the court discerns Mitchell alleged discrimination and retaliation in connection with a January 2017 reorganization and a September 2017 transfer to the Department of Business and Financial Affairs.

Mitchell inquired about the position's duties, Greenway could not provide any details. UNA also relocated Jacques to a new position, but did provide him with some details of the position and the person to whom he would report. After several queries, Mitchell found out her new title, job description, and office location on August 30, 2017; she credits inquiries by the NAACP for disclosure of this information. Mitchell characterizes Greenway and White's actions in connection to this proposed transfer as harassing, retaliatory, and creating a hostile work environment. She also alleges White failed to investigate her July 2017 complaint in accordance with UNA's EEO policy, and had she done so, Defendant would not have forced Mitchell out of her position in Student Affairs and threatened Mitchell with termination for failure to accept the new position in Financial Affairs. She also alleges the timing and lack of information about the new position reflect the transfer was not part of a planned reorganization or restructuring, but instead displays retaliation.

Mitchell asserts her new position has no credibility, nor supervisory and budgetary responsibility. She contends after her transfer, Caucasian counterparts, including Jacques, received more supervisory and budgetary responsibilities, and some received raises, positioning them for possible future raises and promotions. Mitchell avers her job description does not match her actual duties and expresses concern the "made up" position (Doc. 47 at 9) will exclude her from future raises and promotions. Mitchell's current supervisor, Melissa Williams (African-American), asked employees

19

under her supervision to allow Mitchell to assume some of their duties so Mitchell would have job duties. This resulted in Mitchell taking on less desirable tasks such as data entry for manual checks, journal entries for bank statements, review of grant paperwork, rent invoicing, and ordering office supplies.

UNA posted the position of Director of Housing and Residential Life, yet Mitchell never applied for the position. However, Mitchell alleges Defendant's actions convinced her UNA would never allow her to apply for any other position but the one in Financial Affairs. She also decries removal of any mention of her in the Annual Report to the Board of Trustees because of her new position. She depicts UNA's actions as retaliatory and damaging to her career path and other job options because it removed her from a position with supervisory and budgetary responsibilities to one with lesser obligations. However, she does not allege Defendant reduced her compensation.[7]

## I. Eleventh Amendment Immunity and the Limitations Period Bar Mitchell's § 1981 and § 1983 Claims

Section 1983 is a vehicle for redressing violations of federal rights and does not itself create any substantive rights. *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248,

---

[7] In fact, Plaintiff attaches a copy of Defendant's position statement to the EEOC, stating it made Plaintiff Director of Leasing and Property Management and Jacques Director of University Events, maintaining the same pay, benefits, Director-level status, and work hours. (Doc. 47-11 at 3). At the same time, it followed the lead of many universities by combining UNA's housing and resident life departments, under the supervision of a single Director of Housing and Resident Life. (Doc. 47-11 at 1, 3).

1265 (11th Cir. 2010); 42 U.S.C. § 1983.  To assert a cause of action based on § 1983, Mitchell must establish two elements: (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under color of law. *Holmes v. Crosby*, 418 F.3d 1256, 1258 (11th Cir. 2005).  Section 1983 does not abrogate a state's Eleventh Amendment immunity, and "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  This immunity extends to § 1981 suits, as well.  *See Alyshah v. Georgia*, 239 F. App'x 473 (11th Cir. 2007); *Hudson v. Bd. of Trs. of Univ. of Ala.*, No. 2:07-CV-01542-TMP, 2009 WL 10688023 (N.D. Ala. Mar. 31, 2009).

"[F]ederal courts lack [subject-matter] jurisdiction to entertain claims that are barred by the Eleventh Amendment."  *McClendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001).  The Eleventh Amendment precludes private individuals from suing non-consenting states in federal court.  *Id.*  In addition to protecting states from suit by private individuals in federal court, legal doctrine extends Eleventh Amendment immunity to state agencies, instrumentalities, and state officials.  *Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir. 1985).  The Alabama Supreme Court and the Eleventh Circuit consider Alabama's state universities as agencies or instrumentalities. *See id.*; *Rigby v. Auburn Univ.*, 448 So.2d 345 (Ala. 1984); *see also Cox v. Bd. of Trs. of Univ. of Ala.*, 161 Ala. 639, 648 (Ala. 1909) (the Board of Trustees of the University of Alabama are "mere agents of the state"); *Eubank v. Leslie*, 210 F. App'x 837, 844 (11th Cir. 2006)

(the UA Board of Trustees is a state agency for Eleventh Amendment immunity purposes); *Harris v. Bd. of Trs. Univ. of Ala.*, 846 F. Supp. 2d 1223, 1233 (N.D. Ala. 2012) (the UA Board of Trustees is a state agency and thus entitled to Eleventh Amendment immunity against § 1983 claims).

UNA qualifies as a state university. *See, e.g., Knight v. State of Ala.*, 14 F.3d 1534 (11th Cir. 1994) (federal government desegregation suit against Alabama public colleges and universities, including UNA); *Willis v. Univ. of N. Ala.*, 826 So.2d 118, 120 (Ala. 2002) (finding UNA an agency of the State of Alabama); *Price v. Univ. of Ala.*, 318 F. Supp. 2d 1084, 1089 (N.D. Ala. 2003) (holding that an Alabama state university is immune from suit as an arm of the State). Thus, as an arm of the State of Alabama, UNA enjoys Eleventh Amendment sovereign immunity regarding Mitchell's claims under 42 U.S.C. §§ 1981 and 1983.

In addition, the limitations period bars Mitchell's procedural due process claim regarding her 2010 discipline. Because there is no federal statute of limitations for actions brought under § 1983, federal courts must apply the appropriate state statute of limitations. In *Wilson v. Garcia*, 471 U.S. 261 (1985) (*superceded on other grounds by statute as recognized in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004)), the Supreme Court instructed that courts should use the state statute of limitations for personal injury actions for § 1983 claims. In *Owens v. Okure*, 488 U.S. 235, 36 (1989), the Supreme Court clarified that the general or residual statute of limitations governing personal

injury actions constitutes the proper limitations period for § 1983 actions. Alabama's general or residual statute of limitations is two (2) years. *See* Ala. Code § 6-2-38(l); *Holt v. Valls*, 395 F. App'x 604, 606 (11th Cir. 2010). Mitchell commenced this action in 2016, well over two years after the events surrounding her discipline.

Based on immunity and the limitations period bar, the court will dismiss Mitchell's § 1981 and 1983 claims.

## II. State Sovereign Immunity Bars Mitchell's State Law Claims

Mitchell asserts claims for coercion under the Alabama Criminal Code and for defamation, invoking Alabama Code § 15-8-150.[8] Generally, criminal statutes offer no private cause of action unless specifically provided in the statute. *See Walker v. Mobile Police Dep't*, No. CV 17-0117-WS-M, 2017 WL 1398654, at *3 n.3 (S.D. Ala. Apr. 18, 2017) (citing *Love v. Delta Air Lines*, 310 F.3d 1347, 1352-53 (11th Cir. 2002) (indicating that criminal statutes generally do not provide a private cause of action); *Woods Knoll, LLC v. City of Lincoln, Ala.*, 548 F. App'x 577, 581 (11th Cir. 2013) ("[P]ursuant to Alabama law, one claiming a private right of action within a statutory scheme must show clear evidence of a legislative intent to impose civil liability for a violation of the statute.") (citation and internal marks omitted); *Johnson v. Champions*, 990 F. Supp. 2d 1226, 1245 (S.D. Ala. 2014) ("Absent some expression of Congressional intent to create a private right of action, a Mitchell cannot maintain a civil claim against a defendant for

---

[8] This code section refers to forms of indictment.

violation of a federal criminal statute."); *Christian v. Town of Riga*, 649 F. Supp. 2d 84, 90 (W.D.N.Y. 2009) ("Generally, violations of the Criminal Code may not serve as the basis for a civil cause of action unless the statute includes an express or implied private right of action."); *Florance v. Buchmeyer*, 500 F. Supp. 2d 618, 626 (N.D. Tex. 2007) ("a private citizen cannot enforce criminal statutes in a civil action")).

The statute criminalizing coercion does not display any language creating a private right of action; thus, Mitchell cannot maintain a viable civil claim against UNA for violation of that statute. Further, because Alabama Code § 15-8-150 has no connection with defamation, and contains no text suggesting a private cause of action, Mitchell may not maintain a viable claim for violation of that statute.

In reviewing pleadings, courts hold complaints by *pro se* litigants to a less stringent standard and construe them more liberally than pleadings drafted by attorneys. *Boxer X v. Harris*, 437 F.3d 1107, 1110 (11th Cir. 2006). The court will assume Mitchell intends to assert common law tort claims, yet the court must dismiss these claims based on UNA's state agent immunity.

Article 1, § 14 of the Alabama Constitution provides that the State of Alabama cannot be a defendant in any court of law or equity. Sovereign immunity under § 14 bars a court from having subject-matter jurisdiction over claims against the State. *Willis v. Univ. of N. Ala.*, 826 So. 2d 118, 121 (Ala. 2002); *Ex parte Ala. Dep't of Mental Health and Retardation*, 837 So. 2d 808, 810 (Ala. 2002) (citations omitted). In addition,

under § 14 State agencies are "absolutely immune from suit."  *Lyons v. River Road Constr., Inc.*, 858 So. 2d 257, 261 (Ala. 2003)); *see Willis*, 826 So.2d at 121 ("This Court also has held that universities, such as UNA, that are founded by the State and that are under the State's control, are part of the State.").  As a state agency, UNA enjoys immunity under the Alabama Constitution.  *See Vandenberg v. Aramark Educ. Servs.*, 81 So.3d 326, 332 (Ala. 2011) ("We have specifically extended the restriction on suits against the State found in [Ala. Const. art I,] § 14 to the [S]tate's institutions of higher learning and ha[ve] held those institutions absolutely immune from suits as agencies of the State.") (internal citations and quotation marks omitted); *Cardwell v. Auburn Univ. Montgomery*, 941 F. Supp. 2d 1322, 1328 (M.D. Ala. 2013); *Greenwell v. Univ. of Ala. Bd. of Trs.*, No.11-cv-2313, 2012 WL 3637768, *13 (N.D. Ala. Aug. 22, 2012) ("[T]he UA Board of Trustees is immune from Mitchell's state law defamation claim under Article 14 of the Alabama Constitution.") (citations omitted).

Therefore, the court must dismiss Mitchell's state law tort claims because of UNA's state agent immunity.

## III.   Mitchell's Title VII Claims

Mitchell alleges Defendant subjected her to race discrimination, a racially hostile environment, a retaliatory hostile environment, and retaliation, in violation of Title VII. Defendant contends the statute of limitations bars portions of Mitchell's Title VII claims.   Defendant also contends Mitchell fails to state viable Title VII claims because

25

she fails to allege her race factored into any actions taken by Defendant's employees, and her allegations fail to establish any adverse employment action. For the reasons set out in this analysis, the court finds Defendant's motion has merit.

### A. Race Discrimination – Disparate Treatment

Title VII deems it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). This provision "prohibits race-based discrimination that alters the terms and conditions of employment." To establish a prima facie case of race-based disparate treatment, a Mitchell generally must show that: (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) the employer treated similarly-situated employees outside her protected class more favorably, and (4) she was qualified to perform the duties of her job. *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001); *Nix v. WLCY Radio/Rahall Comm'ns*, 738 F.2d 1181, 1185 (11th Cir. 1984). "Although a Title VII complaint need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case, it must provide 'enough factual matter (taken as true) to suggest' intentional race discrimination." *Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted). In

addition to containing well-pleaded factual allegations, complaints must also meet the "plausibility standard" set forth in *Twombly* and *Iqbal*. *See Bowers v. Bd. of Regents of Univ. Sys. of Ga.*, 509 F. App'x 906, 910 (11th Cir. 2013).

An "adverse employment action" includes "termination, failure to hire, or demotion." *Blue v. Dunn Constr. Co.*, 453 F. App'x 881, 884 (11th Cir. 2011). "[N]ot all conduct by an employer negatively affecting an employee constitutes an adverse employment action," and to prove an adverse employment action "an employee must show a serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001). No bright-line test exists for such an analysis, but to support a claim "the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Id.* at 1239. Moreover, the employee's subjective view does not control. *Id.* Although Title VII does not require proof of direct economic consequences, the asserted impact cannot be speculative and must at least have a tangible adverse effect on a plaintiff's employment as "viewed by a reasonable person in the circumstances," regardless of the employee's subjective view. *Id.*

In cases alleging racial bias in disciplinary enforcement, Mitchell must show either (a) she did not violate the work rule, or (b) she engaged in misconduct similar to that of a person outside the protected class and the disciplinary measures enforced against her were more severe than those enforced against the other persons who

engaged in similar misconduct. *King v. Butts Cnty., Ga.*, 576 F. App'x 923, 928 (11th Cir. 2014). As stated previously, Mitchell must demonstrate that she and the comparators are "similarly situated in all relevant respects." *Stone & Webster Const., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1134 (11th Cir. 2012) (citing *Rioux v. City of Atlanta*, 520 F.3d 1269, 1280 (11th Cir. 2008)). To establish a comparator in the disciplinary context, the quantity and quality of the comparator's misconduct must be "nearly identical" to the Mitchell's conduct. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).

### 1. August 2010 Disciplinary

As a prerequisite to filing a lawsuit, a Title VII employee must exhaust administrative remedies by timely filing a charge of discrimination with the EEOC. *See Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (citing 42 U.S.C. § 2000e-5). To be timely, a Mitchell must file an EEOC charge within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e).

Mitchell failed to file an EEOC charge regarding the 2010 discipline resulting in a pay reduction. Therefore, she cannot maintain a Title VII claim for race discrimination based on the 2010 pay reduction. Mitchell claims she only discovered the allegedly discriminatory nature of the pay reduction in 2015; however, her

allegations establish her awareness in 2010 that she received discipline in the form of a pay reduction for the year.

## 2. July 2014 Reorganization

Mitchell contends UNA subjected her to race discrimination regarding the 2014 reorganization. She claims Shields blindsided her at the July 2014 meeting; however, her own allegations establish she received notification of the upcoming reorganization in May 2014. Her allegations fail to raise an inference of intentional race discrimination.

First, Mitchell offers no similarly situated comparator, nor how any comparator received differing treatment. In fact, the conduct Mitchell describes as discriminatory or harassing applied equally to Waddell, a Caucasian employee. Further, the original reorganization proposal would have placed Mitchell and Jacques in the same department under a new Executive Director; thus, the proposed reorganization affected them equally.

In addition, the reorganization did not constitute an adverse employment action. Mitchell received no discipline, reduction in pay, or other material change. Instead of implementing the original reorganization plan, UNA attempted to find a compromise to satisfy Mitchell, all of which she rejected. In fact, when Mitchell resisted remaining under Shields' supervision, UNA ultimately transferred her department to Carter's purview. Therefore, Mitchell achieved her desired result.

### 3. May 2015 Meeting

Mitchell claims race discrimination in connection with the May 2015 meeting at which Shields criticized Mitchell while ignoring mistakes in Jacques' portion of UNA's website. Mitchell has not plausibly pleaded that Shields' conduct during this incident resulted from racially discriminatory animus. Further, Shields did not subject Mitchell to adverse employment action, as Mitchell did not plausibly plead a serious and tangible adverse effect upon her employment terms, conditions, and privileges.

### 4. June 2015 Board of Trustees Meeting

Regarding the June 2015 Board of Trustees meeting, Mitchell does not plausibly plead a race discrimination claim. Jacques did not serve as a decision maker whose conduct could render UNA liable, and Shields corrected the error in the handout when it came to his attention, before the start of the meeting. In addition, Mitchell's allegations fail to depict an adverse employment action, as Mitchell did not plausibly plead a serious and tangible adverse effect upon her employment terms, conditions, and privileges.

### 5. Mediation Effort

Mitchell avers UNA's hiring of Mike Quinn to mediate the disputes between Mitchell, Jacques, and Shields resulted from racially discriminatory animus. She faults UNA for initiating an investigation regarding matters which supposedly occurred while failing to investigate incidents about which Mitchell complained. However, bringing an outside mediator with extensive employment litigation experience demonstrates UNA's good faith effort to seek a reasonable solution to resolve the situation, not to engage in discrimination. Jacques and Shields also had to participate in the mediation; therefore, they also experienced the same circumstances as Mitchell and cannot serve as comparators. Finally, no adverse employment action exists based on these facts, as Mitchell did not plausibly plead a serious and tangible adverse effect upon her employment terms, conditions, and privileges.

### 6. 2017 Reorganization and Job Transfer

Mitchell also characterizes the 2017 reorganization and job reassignment as discriminatory. Initially, White proposed combining the Housing and Residence Life departments under one Executive Director, Greenway, who reported to Shields. When Mitchell expressed concern about the move, White contacted her and received her statement. Ultimately, Defendant acquiesced to Mitchell's trepidation and did not require her to move to an office near Jacques. Instead, Defendant formulated a way to distance Mitchell from Jacques and Shields by creating a Director-level position in

another department, in which Mitchell retained the same pay, benefits, and hours. Thus, Mitchell has not plausibly pleaded UNA displayed discriminatory animus by these actions or engaged in an adverse employment action.

### 7. Additional Allegations

Mitchell describes other events she claims are discriminatory. She faults Cale for failing to meet with her in 2010 regarding her complaints about Shields, despite meeting with and counseling Greenway regarding her complaints about Shields. Mitchell cites the backlash from the newspaper article in May 2013 as racially discriminatory. She also complains UNA never investigated or disciplined Jacques for the alleged, larcenous actions of his Resident Assistants in July 2013. In addition, she contends UNA's failure to allow her to copy her personnel file in early 2014, before Cale left, exhibits discrimination. Mitchell did not file a timely EEOC charge regarding any of these allegations; therefore, the court must dismiss any Title VII claim based on these incidents because they are time-barred.

Mitchell complains that she did not appear in the 2015-2016 UNA catalog. However, such omission does not rise to the level of an adverse employment action nor plausibly suggest the omission resulted from race discrimination.

Mitchell mentions Jermaine Ferguson as support for her claims of race discrimination and retaliation. However, that Shields and Jacques offered Ferguson a position in their department does not constitute a materially adverse employment

action.  Further, Mitchell remained unaware that Shields and Jacques questioned Ferguson about her until after his termination, and Mitchell suffered no adverse consequences, such as demotion or termination.

Carter's comments to Mitchell about her EEOC charge and her complaints do not plausibly constitute discrimination nor harassment; rather, the court views his comments as career and work advice that do not represent an adverse action.

Mitchell compares the handling of her complaints about Shields and Jacques to those by the Caucasian women who complained of gender harassment.  Regarding their complaints, Mitchell offers only bare factual allegations which fail as a proper averment of race discrimination.  Mitchell offers insufficient allegations to demonstrate she was similarly situated to the women who complained about their supervisor.  Further, she alleges no adverse employment action connected with her complaints.  The 2010 pay reduction remains the only plausible adverse employment action Mitchell suffered.

Mitchell complains that UNA lied to the EEOC during its investigation into Mitchell's charge.  However, participants in litigation have absolute immunity from civil liability for communications made in connection with and relevant to a judicial proceeding, including communications preliminary to a proposed judicial proceeding. *Rehberg v. Paulk,* 566 U.S. 356, 367 (2012); *Jones v. Cannon*, 174 F.3d 1271, 1281 (11th Cir. 1999); *Smith v. Haynes & Haynes PC*, No. 2:14-CV-1334-RDP, 2015 WL 4173024, at *6

(N.D. Ala. July 10, 2015).

## B. Retaliation

Title VII's anti-retaliation provision provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. §2000e-3(a) (1982). To press a retaliation claim, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) some causal relation exists between the two events. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). A materially adverse action includes conduct that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. 68. A plaintiff must also demonstrate that the desire to retaliate was the "but-for" cause of the challenged employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360.

To sustain this burden with circumstantial evidence, a plaintiff must rely on a burden-shifting approach akin to the *McDonnell Douglas* framework. *See Furcron v. Mail*

34

*Ctrs. Plus, LLC*, 843 F.3d 1295, 1310-11 (11th Cir. 2016) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).   If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to proffer a legitimate non-retaliatory reason for the materially adverse action.   *Crawford v. Carroll,* 529 F.3d 961, 976 (11th Cir. 2008).   If the employer proffers a legitimate reason, the burden shifts back to the employee to show that the legitimate reason was pretext for prohibited retaliatory conduct.   *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).   The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning.   *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

### 1. August 2010 Disciplinary

As discussed above, Mitchell failed to file an EEOC charge regarding the 2010 discipline resulting in pay reduction.   Therefore, she cannot maintain a Title VII claim for retaliation based on the 2010 pay reduction.

### 2. July 2014 Reorganization

Mitchell contends the July 2014 reorganization constituted retaliation for her earlier complaints of discrimination.   She claims Shields blindsided her at the July 2014 meeting; however, her own allegations establish she received notification of the upcoming reorganization in May 2014.   In addition, the reorganization did not constitute a materially adverse action.   Mitchell received no discipline, reduction in pay,

or other material change in her employment. Rather than implementing the original reorganization plan, UNA attempted to find a compromise to satisfy Mitchell, all of which she rejected. In fact, when Mitchell resisted remaining under Shields' supervision, UNA ultimately transferred her department to Carter's purview. Therefore, Mitchell achieved her desired result. Finally, Mitchell has not plausibly pleaded that her complaints constituted the but-for cause of UNA's reorganization plans and its effect upon her.

### 3. May 2015 Meeting

Mitchell claims Shields' criticism at the May 2015 meeting regarding errors on her department's webpage constituted retaliation. However, mere criticism, without more, does not plausibly represent a materially adverse action. UNA imposed no discipline on Mitchell; thus, she suffered no tangible harm. Furthermore, Mitchell has not plausibly pleaded that her complaints constituted the but-for cause of the criticism.

### 4. June 2015 Board of Trustees Meeting

Regarding the June 2015 Board of Trustees meeting, Mitchell identifies no materially adverse action which would support a retaliation claim. Further, Shields corrected the misinformation in the report prior to the meeting. Furthermore, Mitchell has not plausibly pleaded that her complaints constituted the but-for cause of Shield's erroneous information.

### 5. August 2016 Fire Alarm

Mitchell asserts Shields' unannounced visit to her office constituted part of the retaliatory harassment she experienced. However, Shields entered Mitchell's office to advise her to evacuate the building out of concern for her safety, as the fire alarm continued to sound in the building. These facts plainly fail to demonstrate a materially adverse action, and strike the court as neither harassing nor hostile, nor as an act of retaliation for her EEOC charge. Furthermore, Mitchell has not plausibly pleaded that her complaints constituted the but-for cause of Shields's warning.

### 6. Mediation Effort

Mitchell avers UNA's hiring of Mike Quinn to mediate the disputes between Mitchell, Jacques, and Shields demonstrates retaliatory intent. However, bringing an outside mediator with extensive employment litigation experience demonstrates UNA's good faith effort to seek a reasonable solution to resolve the situation, not to engage in discrimination or retaliation. On these facts, requiring Mitchell to mediate does not constitute a materially adverse action. Further, Jacques and Shields also had to participate in the mediation; therefore, they also experienced the same circumstances as Mitchell.

### 7. 2017 Reorganization and Job Transfer

Mitchell challenges Defendant's 2017 decision to reorganize and transfer her back under the auspices of Shields and in an office next to Jacques. However, upon

notification of the reorganization Mitchell expressed the desire for an alternative that would not subject her to Shields and Jacques. To accomplish Mitchell's stated desire, Defendant moved her to a different department, yet Mitchell retained her Director title, compensation, benefits, and hours. Therefore, Defendant attempted to accommodate Mitchell's requests while still allowing for the effective functioning of UNA. While Mitchell expresses her concern that she will lose raises and promotion opportunities, her apprehension presents only speculation. Furthermore, Mitchell has not plausibly pleaded that her complaints constituted the but-for cause of the reorganization plans and her transfer to another position.

Mitchell had the opportunity to apply for the Director of Housing and Residence Life but chose not to based on her own conclusions. No action of Defendant prevented her from applying; only her own expectations as to the outcome caused her to miss the opportunity. The failure to apply for a position precludes any claim of retaliatory failure to promote in the absence of a "justifiable belief" that Defendant's discriminatory hiring practices made application a futile gesture. *Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 228-29 (11th Cir. 2011) (citing *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1274 (11th Cir. 2002)); *see also Williams v. VWR Int'l, LLC*, 685 F. App'x 885, 888 (11th Cir. 2017) (for purposes of the "futile gesture" exception to the application requirement, a plaintiff must demonstrate she would have applied for the job but effectively was deterred from doing so by the employer's discriminatory

practices, but conclusory allegations of discrimination, without more, do not suffice to raise an inference of discrimination); *Cooper v. Diversicare Mgmt. Servs. Co.*, 115 F. Supp. 2d 1311, 1318 (M.D. Ala. 1999) (plaintiff's failure to promote claim failed absent evidence that defendant discouraged her, advised her not to apply, or misled her as to the position's qualification requirements). Mitchell's allegations fail to create an inference of a justifiable belief that Defendant would not consider her for the position had she applied, and she advances no claim Defendant discouraged her or advised her not to apply for the position.

### 8. Additional Allegations

Mitchell describes other events she also claims constituted retaliation. She faults Cale for failing to meet with her in 2010 regarding her complaints about Shields, despite meeting with and counseling Greenway regarding her complaints about Shields. Mitchell cites the backlash from the newspaper article in May 2013 as retaliatory. She also complains UNA never investigated or disciplined Jacques for the alleged, larcenous actions of his Resident Assistants in July 2013. In addition, she contends UNA's failure to allow her to copy her personnel file in early 2014, before Cale left, exhibits retaliation. Mitchell did not file a timely EEOC charge regarding any of these allegations; therefore, the court must dismiss any Title VII claim based on these incidents because they are time-barred.

Mitchell complains that she did not appear in the 2015-2016 UNA catalog. However, such omission does not plausibly state a materially adverse action that would dissuade a person from lodging complaints. Furthermore, Mitchell has not plausibly pleaded that her complaints constituted the but-for cause of her omission from the catalog.

Mitchell mentions Jermaine Ferguson's circumstances as support for her retaliation claim. However, that Shields and Jacques questioned Ferguson about Mitchell does not plausibly state a materially adverse action that would dissuade her from complaining about discrimination (as clearly it did not).

Carter's comments to Mitchell about her EEOC charge and her complaints do not plausibly constitute a materially adverse action as there exists no detriment occasioned by the statements.

Mitchell compares the handling of her complaints about Shields and Jacques to those of the Caucasian employees who complained of gender discrimination, principally because their complaints allegedly resulted in the suspension of the alleged harasser. Mitchell has not demonstrated a plausible materially adverse action or even that her complaints were the but-for cause of any divergent treatment.

## C. Racially Hostile Environment

To establish a Title VII hostile work environment claim, Mitchell must prove that the "the workplace is permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quotations and citation omitted); *Fortson v. Carlson*, 618 F. App'x 601, 605-06 (11th Cir. 2015). If Mitchell bases her hostile work environment claim on race, she must prove five elements: (1) she belongs to a protected group; (2) she has been the subject of unwelcome harassment; (3) the harassment was based on her race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) the employer was responsible for such environment under a theory of vicarious or direct liability. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248-49 (11th Cir. 2014).

The fourth element requires Mitchell to show her work environment is both subjectively and objectively hostile or abusive. *Id.* at 1249. Mitchell must subjectively perceive the harassment as sufficiently severe or pervasive to alter the terms or conditions of employment, while the objective severity of harassment is judged from the perspective of a reasonable person in Mitchell's position. *Id.*

To evaluate whether a work environment is objectively hostile, the Supreme Court in *Harris* identified the following factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and, (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir.

41

1997) (citing *Harris*, 510 U.S. at 23). Thus, "[i]n the light of these factors, we ask whether, under the totality of the circumstances, a reasonable person would find the harassing conduct severe or pervasive to alter the terms or conditions of the plaintiff s employment." *Adams*, 754 F.3d at 1251.

The *Harris* factors do not constitute "a mathematically precise test," and no single *Harris* factor is required for Mitchell to show the fourth element of her hostile work environment claim. *See Harris*, 510 U.S. at 23. Instead, the inquiry into the objective severity of the harassment is fact intensive and involves a consideration of all of the circumstances. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*).

It is a "bedrock principle [in the Eleventh Circuit] that not all objectionable conduct or language amounts to discrimination under Title VII." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (citation and internal quotation marks omitted). Indeed, "Title VII does not prohibit . . . harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category such as [race]." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1301-02 (11th Cir. 2007). *See also Jones*, 683 F.3d at 1297 ("[O]nly conduct that is 'based on' a protected category, such as [gender], may be considered in a hostile work environment analysis.") (citation omitted). Therefore, "innocuous statements or conduct, or boorish ones unrelated to a protected ground are

not counted" in a hostile work environment claim. *Byrd v. Postmaster Gen.*, 582 F. App'x 787, 790 (11ᵗʰ Cir. 2014) (internal quotes and citation omitted).

In this case, Mitchell has described incidents, which undoubtedly unpleasant, fail to rise to the level of a severe and pervasive racially hostile environment. She identifies no racially derogatory comments or other such actions specifically targeted at her or other African-American employees. While Mitchell subjectively experienced stress from her dealings with Shields, Jacques, and other UNA employees, she has not alleged this interfered with her ability to perform the duties of her job.

The allegations also do not establish an inference any harassment Mitchell resulted from her race.[9]

---

[9] *See Fortson v. Columbia Farms Feed Mill*, 34 F. Supp. 3d 1302, 1304 (M.D. Ga. 2014), *aff'd sub nom. Fortson v. Carlson*, 618 F. App'x 601 (11ᵗʰ Cir. 2015) (no racially hostile environment based on evidence of twelve instances of coworkers yelling at plaintiff, cursing at him, and calling him racial epithets during two-and-a-half years of employment, with name-calling apparently stemming from coworkers' expression of dissatisfaction with plaintiff's job performance); *Gobert v. Saitech, Inc.*, 439 F. App'x 304 (5ᵗʰ Cir. 2011) (plaintiff did not experience racially hostile environment, when he alleged that his director embarrassed him a couple of times at meetings, without referencing his race, and assigned him to an inferior office); *c.f., Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240 (11ᵗʰ Cir. 2014) (racially hostile environment found when plaintiffs frequently heard white employees and supervisors use racial slurs, saw a Confederate flag every morning, frequently saw racist graffiti in the restrooms, and found a noose in the breakroom); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1300 (11ᵗʰ Cir. 2012) (jury question presented by evidence plaintiff found banana peels on his vehicle on four occasions and was followed by other employees wearing shirts or hats bearing Confederate flags; after the third time plaintiff found banana peels, he complained, then two of the employees approached him, one bearing a crowbar or other metal tool, inquiring whether plaintiff had reported them); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11ᵗʰ Cir. 2002) (plaintiff raised triable issue regarding racially hostile environment when plaintiff's supervisor hurled racial epithets at plaintiff several times a day for two months; used the derogatory names in an intimidating manner, shouting them at the plaintiff during the course of berating him for his job performance in front of others, or when arguing with him; and plaintiff was prevented from performing his job as a result on at least one occasion); *Perkins v. Lynch*, 169 F. Supp. 3d 1246 (N.D. Ala. 2016) (summary judgment denied where alleged retaliatory acts taken

## D. Retaliatory Hostile Environment

A court also considers a retaliatory hostile environment claim using the *Harris* factors. *Gowski v. Peake*, 682 F.3d 1299, 1312-13 (11th Cir. 2012). While retaliatory intent must be the "but-for" cause of retaliation to maintain an individual retaliation claim, *see Nassar*, 570 U.S. at 342, the Eleventh Circuit has held that a retaliatory hostile environment can survive on a mixed-motive theory. *See Gowski v. Peake*, 682 F.3d 1299, 1313 (11th Cir.2012) ("[T]he jury here found that the discrete acts were motivated in part by retaliatory animus. Although that may be sufficient under the same-decision defense to preclude liability for each of the acts individually, it is not enough to eliminate liability for the hostile environment caused by the retaliatory animus when the discrete and non-discrete acts are taken collectively."). As the appellate court explained in *Gowski*, "the but-for causation that matters in a retaliatory hostile work environment claim" is "the severe and pervasive accumulation of actions that would not have occurred but-for the retaliatory reason, even if each action alone was justifiable." *Id.*

---

against plaintiff included temporary duty assignment out of state, not receiving a quality step increase award, frequent changing of work assignments, and instances in which supervisor did not allow plaintiff to work on cases to which he was assigned); *Doxie v. Volunteers of Am., SE, Inc.*, 37 F. Supp. 3d 1215, 1220 (N.D. Ala. 2014), *on reconsideration in part*, No. 3:12-CV-3702-AKK, 2014 WL 12607790 (N.D. Ala. Dec. 2, 2014) (summary judgment denied where plaintiff adduced evidence co-workers made disparaging and humiliating remarks about African–Americans in her presence almost daily for eight years); *Johnson v. Austal, U.S.A., L.L.C.*, 805 F. Supp. 2d 1299 (S.D. Ala. 2011) (summary judgment denied based on plaintiff's evidence Caucasian co-workers and supervisors called plaintiff "boy," acted like monkeys to an African-American co-worker, kicked plaintiff and African-American co-workers, told plaintiff they wished "these n__s would do something," commented "all you need is a little slave power," subjected plaintiff to displays of Confederate flag t-shirts, wrote racial graffiti on bathroom walls, and hung nooses).

Mitchell's allegations also fail to state a claim for a retaliatory hostile environment. Mitchell began complaining about perceived race discrimination to the UNA President in 2010, when she appealed the pay reduction. From that time forward, she experienced actions which she considered retaliatory. As with her racially hostile environment claim, Mitchell subjectively perceived the harassment as severe and pervasive. However, her allegations fail to establish the alleged harassment qualifies as objectively severe or pervasive. The conduct alleged does not plausibly exhibit demeaning, physically threatening, or humiliating conduct; rather, they reflect workplace tribulations. Furthermore, Mitchell does not plausibly allege the conduct unreasonably interfered with her work performance.

## CONCLUSION

Based on the foregoing analysis, the court **GRANTS** Defendant's Motion for Judgment on the Pleadings. The court deems **MOOT** Mitchell's Motions to Compel (Docs. 33 & 46) and Mitchell's Motions for Judgment on the Pleadings (Docs. 36 & 42). The court will enter a separate order in conformity with this Memorandum Opinion.

**DONE** this 31st day of August, 2018.

_H. Johnson, Jr._
_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE